UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI SUMNER,

       Plaintiff,

v.

BEAUMONT HEALTH SYSTEM and
BEAUMONT HOSPITAL TAYLOR,

       Defendants.

Case No. 20-13163
Honorable Laurie J. Michelson

---

# OPINION AND ORDER GRANTING
## BEAUMONT'S MOTION FOR SUMMARY JUDGMENT [27]

---

Lori Sumner, who is a Black woman, worked as a clinical nurse manager for Beaumont Health System at its Taylor hospital. As a nurse manager, she had various responsibilities involving the nurses in the Medical/Surgical unit, including staffing, scheduling, ensuring patient and staff safety, and rounding with patients on her floor.

Starting in 2018, Sumner's supervisors observed that Sumner was not performing to their expectations. Despite coaching and performance plans, they did not feel Sumner's performance improved as of December 2019. So Sumner was terminated.

Sumner has a different take. In December 2018, Sumner applied to two director-level positions, which would have been a promotion for her. She was not interviewed for either one. Sumner believed that she had been discriminated against in the selection process because of her race and made complaints about this

discrimination. According to Sumner, it was only after she complained that she was placed on an unwarranted performance plan.

So after her termination, Sumner brought this lawsuit against Beaumont, alleging, among other things, that Beaumont violated Title VII and Michigan's Elliott-Larsen Civil Rights Act. Specifically, she states that Beaumont discriminated against her because of her race by not promoting her to a director position and by terminating her. She also alleges that Beaumont retaliated against her for complaining about race discrimination.

Before the Court is Beaumont's motion for summary judgment on all claims. For the reasons given below, Beaumont's motion is GRANTED.

## I.

### A. Chronology of Events

Lori Sumner has been a registered nurse since 2010. (ECF No. 36-3, PageID.1052.) Her first job with Beaumont Health System was at Beaumont Royal Oak as an associate nursing manager in 2016. (*Id.* at PageID.1061.) In July 2017, she was promoted to clinical nurse manager of the 2 West Medical/Surgical (Med/Surg) unit at Beaumont Taylor. (*Id.* at PageID.1071.)

At the time of her promotion, Sumner had no documented performance or disciplinary issues. To the contrary: Sumner received numerous accolades for her work as a nurse. In January 2017, she was nominated for a "Best in Nursing" award, which honors the 100 best nurses in every state. (ECF No. 36-2, PageID.995.) In December 2018, she was invited to speak to nursing leadership at Beaumont

Farmington Hills. (*Id.* at PageID.998.) She also earned, with Beaumont's support, her Nurse Executive Certification in January 2019. (*Id.* at PageID.1002.)

When Sumner first started as clinical nurse manager of Med/Surg, she reported to Edie English, who was the Director of Nursing at Beaumont Taylor. In turn, English reported to Kristin Donahue, who was Chief Nursing Officer for Taylor. (ECF No. 27-3, PageID.266.) English states that, within four to six months of hiring Sumner, she observed performance issues with Sumner. (ECF No. 27-9, PageID.522.) These issues included not being visible to her staff or physically present on her unit for at least 40 hours per week, not completing rounds with patients, and not ensuring that her nurse staff completed bedside shift reports. (*Id.* at PageID.523–524.) English worked with Sumner so she could improve in these areas. (ECF No. 27-12, PageID.532; ECF No. 27-11, PageID.529 ("I will give [Sumner] a chance to re-focus and I will be asking for detailed daily activity[.] I am also requiring her to see am shift report 3 days a week[.]").)

In September 2018, English left her position as director (ECF No. 27-9, PageID.521), and Donahue asked Iyanna Brown to act as the interim director of Sumner's department (ECF No. 27-6, PageID.420). Brown picked up where English left off by helping Sumner with the bedside shift reports, shadowing rounds, and staffing. (ECF No. 27-12, PageID.533.) Brown also supported Sumner with completing "RLs," which are safety incident reports that need to be investigated and closed, and her Culture of Safety (COS) scores. (ECF No. 27-13, PageID.542.) Culture

of Safety is a survey given to staff, including Sumner's staff, that gathers employees' views on safety in the workplace.[1] (ECF No. 27-6, PageID.429.)

In December 2018, Sumner applied for two director-level positions: Director of Nursing for Critical Care and Director of Nursing for Med/Surg over both the Taylor and Wayne Beaumont hospitals. (ECF No. 27-2, PageID.239; ECF No. 27-4, PageID.356.) Sumner testified that she did not receive an interview for either position, but no one else was ultimately hired for the positions. (ECF No. 36-3, PageID.1031,1151.) Other individuals were interviewed for these positions, however, and Sumner was on those interview panels. (ECF No. 27-35, PageID.658.) After these positions were canceled, another Director of Nursing position was posted for just the Taylor hospital. (ECF No. 36-12, PageID.1231.) Sumner did not apply for that job because the application "was not made available to me. I did not see those postings. . . . I was not aware of that." (ECF No. 36-3, PageID.1151.)

After working with Sumner for a few months, Brown testified that she consulted with Donahue for advice on certain areas that Sumner struggled with. (ECF No. 27-6, PageID.443.) She also reached out to Karen Krolicki, who works in Human Resources, to assist. (*Id.*) In January 2019, Brown and Donahue discussed placing Sumner on a performance improvement plan, and on February 7, 2019, Donahue drafted a performance action plan or PIP (the two are used seemingly interchangeably) for Sumner. (ECF No. 27-38, PageID.666–667.) The performance

---

[1] The Court will discuss these and other performance issues in more detail in Section I.B below.

plan given to Sumner was dated March 1, 2019 and stated that it was from Brown. (ECF No. 27-47, PageID.757.)

In the plan, Sumner was to work on issuing corrective actions for attendance at the end of each pay period, escalating barriers stemming from pilots/initiatives in a timely manner, investigating her RLs in a timely manner (which included starting the investigation within 48 hours of receiving them), turning in requested reporting items on time, and focusing on developing "leadership competencies," such as communicating, driving results, and managing conflict. (ECF No. 27-47, PageID.757.) Sumner submitted a "rebuttal" to the plan, detailing her accomplishments as a nurse manager and either refuting or explaining why the items listed in the plan were not performance issues. (ECF No. 27-43, PageID.692–694.) Sumner wrote that the corrective actions and RLs were "not an issue" and were done in a timely manner. (*Id.* at PageID.694.) For the other items, she explained that the unit struggled with certain projects and reports, or she described her plan to solve the issue. (*Id.* at 694–695.)

Around the same time as her placement on a PIP, Sumner complained to human resources that she was not selected to interview for the two director positions she applied for because of her race and gender. She made a verbal complaint to Krolicki and Brown on February 18, 2019. (ECF No. 36-3, PageID.1109.) And she submitted a written complaint on March 11, 2019, stating, "I believe I was discriminated against for a Director of Nursing position at Beaumont Taylor . . . I was not even granted an interview for either position; and after bringing it to the attention

5

of the HR Director in my facility, a few days later I was presented with a Performance Action Plan that I did not sign because I have evidence to show that it is inaccurate and unwarranted." (ECF No. 27-45, PageID.713.)

Sumner's complaints were investigated, seemingly by speaking to Krolicki who explained that discussions to put Sumner on a PIP started in late January 2019 (which was before Sumner's complaint), and that Sumner had been told about the plan when she made her verbal complaint on February 18, 2019. (ECF No. 27-35, PageID.658.) The investigation report for the complaint concluded that Sumner's "concern was not substantiated. Appropriate hiring practices were followed." (*Id.*)

Sumner made a few other complaints to Beaumont. In April 2019, she complained, "I still have some concerns that have not been addressed regarding the discrimination that I explained in my original report." (ECF No. 27-45, PageID.713.) She wrote to Joanne Tuscany, the director of HR, about her complaint as well. (ECF No. 36-9, PageID.1218.) In May 2019, Sumner complained again, stating, "I continue to feel that I am not being treated fairly or equitably by some here at Beaumont Taylor." (ECF No. 36-9, PageID.1220.) Sumner described an incident where her supervisor asked her to "produce proof that I was at the Dentist office on my weekend day off." (*Id.* at PageID.1219.) Sumner said she was humiliated and offended by this request. (*Id.*) In June, Sumner followed-up on her complaint again, adding that she was also concerned that, when she was on an interview panel, the candidate said that "she was tapped on the shoulder by Nursing Leadership to apply for the management position." (*Id.* at PageID.1217.) Sumner wanted to be sure that the "interview

selection process" was "fair" and that Beaumont was not "being discriminatory in who is selected to interview for leadership positions." (ECF No. 36-9, PageID.1217.)

As for the performance issues in the plan, Brown testified that when Sumner reported to her, "there was no improvement, so she was still on the performance action plan." (ECF No. 27-6, PageID.444.)

There was another change of Sumner's supervisor in May 2019. Jennifer Matson was hired as the Director of Nursing for the Taylor hospital (the role that replaced the two job postings Sumner applied to). (*See* ECF No. 27-7, PageID.466.) Matson "wasn't involved in [Sumner's] PIP," but she sent all of her direct reports a 30, 60, 90-day plan and used this plan "specifically to manage performance in Lori's case." (ECF No. 27-7, PageID.476, 490.) So it seems as if Sumner was no longer on her formal PIP, and instead reported to Matson via the 30, 60, 90-day plan. In October 2019, Sumner acknowledged that she was told by Matson that she "was the only CNM doing a 30-60-90 day action plan due to my low COS scores although other units such as the ER & ICU & IMC contributed heavily to the reasons why my staff were feeling unsafe." (ECF No. 27-73, PageID.882.) This plan included many of the same items in Sumner's PIP, such as increasing Sumner's presence on the floor, reviewing RLs with staff, addressing Culture of Safety issues, increasing staff huddles, and addressing scheduling issues. (ECF No. 36-17, PageID.1351–1352.) Many of the items on the plan are categorized as either complete, ongoing, or on track to be completed. (*Id.*)

But Matson too had concerns about Sumner's performance. She testified that Sumner's progress in completing these items was not "consistent" and that the plan

was not "continuously kept up" such that it accurately reflected Sumner's progress. (ECF No. 27-7, PageID.492.) According to Matson, issues with the RL investigations were a "very inconsistent practice with Lori. She might have opened them one week and then done really poorly the next week." (*Id.* at PageID.482.) Matson also said that Sumner had trouble updating her Culture of Safety items and keeping her team informed during staff huddles. (ECF No. 27-7, PageID.485.) In December 2018, Donahue asked Matson if she thought Lori was progressing appropriately. (*Id.* at PageID.496.) Matson told Donahue that Sumner "was not consistent in her practices" and that she does not recommend Sumner stay in her role. (*Id.*)

On December 4, 2019, Sumner was terminated. (ECF No. 27-71.)

## B. Performance Issues

Beaumont states it fired Sumner for her "continued poor performance." (ECF No. 27, PageID.203; *see also* ECF No. 27-71 (termination document).) Notably, throughout her time at Beaumont Taylor, Sumner never received a formal annual evaluation. But Beaumont says that Sumner struggled with various tasks throughout her time as nurse manager, which supports its decision to terminate her.

More specifically, English, Sumner's supervisor when she first started as a clinical nurse manager, stated that she observed issues with Sumner's "visibility" on the unit. (ECF No. 27-9, PageID.523.) She recalls looking for Sumner at the hospital, only to learn that Sumner was not there. (*Id.*) English also states that she told Sumner she was required to lead 7:30 a.m. huddles with her staff, but Sumner was seldom, if ever, present at those huddles. (*Id.*) English also says that Sumner was

8

required to "round daily with each patient" in the unit, but Sumner often did not complete these rounds or turn in the paperwork associated with the rounds. (*Id.* at PageID.524.)

Sumner also had issues investigating and closing out the "RLs." RLs refers to safety or staffing concerns submitted to the RL Solutions software, which then get reviewed by Beaumont's Quality Department and referred for investigation to the appropriate department manager. (ECF No. 27-4, PageID.350.) Brown, who became Sumner's supervisor after English left, stated that she would often have to discuss investigating RLs in a timely manner with Sumner. (ECF No. 27-6, PageID.452.) Emails from December 2018 detail Sumner's issues with closing out RL reports on time—though Sumner maintains that she had completed the reports on time, but that the system did not record her actions properly. (ECF No. 27-14; ECF No. 27-13, PageID.536–540.) The issue escalated to the point where an employee in Patient Safety shared concerns with human resources about whether Sumner was being truthful about completing the RLs on time. (ECF No. 27-15, PageID.558.)

As of April 2019, Brown did not believe that Sumner's RL investigations had improved. (ECF No. 27-49, PageID.764.) In fact, Brown received an email from the Quality Department stating, "This morning [April 10, 2019] she backdated a note to reflect 04/08/19 which is shown in the audit." (ECF No. 27-53, PageID.778.) Brown forwarded this information to Donahue and said, "This is very concerning, please see RL below where Lori back dated the information further confirming her lack of integrity in these serious safety follow ups that are to assist us in keeping our staff

and patients safe." (*Id.*) There is evidence that the issue with RLs continued into August and September 2019. (ECF Nos. 27-63, 27-64.)

Another safety issue involved the ordering of bed alarm cords. On March 20, 2019, Sumner tells Donahue and Brown that, "The 2 West Team was working on our . . . Call Light Response Times/Fall Reduction Strategies; and the [nurse assistants] said if we can ensure that the additional bed alarm cords are not missing, it would help all get to that special flashing call light that lets you know a bed alarm is going off even quicker because you can hear it, and that additional cord helps you see it." (ECF No. 27-55, PageID.794.) Sumner identified 18 missing or malfunctioning cords. On April 10, Donahue responded, "This is the last communication I received from you regarding the bed cords. With the number of falls occurring on units you cover, I would expect that ordering and ensuring immediate delivery of these bed cords would have been a priority." (*Id.*) The next day, Brown responds to Donahue, "Michelle put in for the bed cords on 3/26 the same day you approved them, Michelle emailed Lori same day to let her know she needed to approve. I was not notified until Monday 4/8/19, that Lori still had not approved at which I told her to get this done[.]" (*Id.* at PageID.793.)

Emails between Donahue, Brown, and other Beaumont employees detail their concerns with Sumner's ability to correctly schedule her staff. One email from March 2019 explains that Sumner had not taken a nurse who had resigned off the schedule. (ECF No. 27-56.) This created confusion as to whether leadership could take a nurse from the Med/Surg department to cover a different, understaffed department and

caused tension among the nurse staff and leadership. (*Id.*) Brown was aware of similar issues in July 2019: "Lori knew her staffing was bad and did not inform Kristen." (ECF No. 27-59.)

Sumner's supervisors also had concerns over Sumner not encouraging or supporting different initiatives for her department. One example is the patient journal initiative, which was a program where certain nursing departments would distribute journals to patients so the patients could write down any questions or concerns and submit them to Beaumont staff. (ECF No. 27-6, PageID.437.) In November 2018, Donahue addressed this concern with Sumner after learning that few surveys had been returned. (ECF No. 27-18, PageID.573.) Sumner told Donahue that her team was having trouble collecting the surveys due to "competing priorities and tasks that must be done at the time of discharge[.]" (*Id.* at PageID.570.) Donahue responded that Sumner should have escalated these issues earlier, and that she wanted to identify areas where Sumner could improve "to make advancement possible for you." (*Id.*) Donahue went on to say that "[t]he role of a director is having the capacity to navigate many competing priorities, identify breakdowns, and work with the team to implement strategies for improvement." (*Id.*)

Another initiative involved distributing articles to staff members during safety huddles and having staff brainstorm suggestions for "fall prevention on our unit." (ECF No. 27-22, PageID.584.) The project would also include a "tri fold project board left in the common area of the surgical station for brainstorming and pledges." (*Id.* at PageID.585.) Sumner did not respond to the email detailing the project, so it did not

go forward. (*Id.*) An employee forwarded the exchange to Donahue, stating, "I think it is an example of why some of the nurses aren't engaged." (*Id.*)

A few of Sumner's staff also complained about her leadership. An anonymous employee complained about Sumner showing favoritism to one particular nurse: "Lori Sumner continues to allow ONE specific nurse to be out of staffing while the floor works short. This is favoritism and the staff [are] out raged that this continues to happen. . . . Staff is upset and have brought this to Lori['s] attention several time[s]. The outcome is the same, Lori acts as if she does not know this [is] going on REALLY. We need leaders not bosses that manage from afar." (ECF No. 27-20, PageID.579.) In the Culture of Safety evaluation, Sumner received a number of similar comments about favoritism toward certain employees and how it impacted staffing. (*See* ECF No. 27-28, PageID.617.) Complaints about favoritism were also submitted in the Engagement Survey results, which were distributed to Matson and those at the "administrative level." (ECF No. 27-65, PageID.837, 840.) These results also indicated general dissatisfaction with understaffing. (*Id.* at PageID.840–841.)

Emails between Brown and Donahue indicate that they recognized similar deficiencies in Sumner's leadership. Donahue noted that Sumner, "talks at [her staff] too much. They are not allowed to voice their thoughts without feeling shot down." (ECF No. 27-19, PageID.575.) Brown responded, "I agree Lori does talk at them way too much! I've expressed this to her with no change[.]" (*Id.*)

Perhaps related to the complaints about favoritism, Brown also noted that Sumner did not issue corrective actions for attendance violations and had continued

issues with scheduling an appropriate number of nurses. Brown stated, "This is really causing a strain on her team as well as others that have to work with her." (ECF No. 27-49, PageID.764.)

Sumner's supervisors also noted issues with Sumner's accountability. For example, Matson wrote to Donahue, "[Lori] asked if any other managers had to submit work plans to me. I explained that her scores are the lowest in [the] system and have went down each survey. Accountability is hard with her. It's one step forward, two steps back with her." (ECF No. 27-62, PageID.830.)

Matson also testified that in early December 2019, right before Sumner was terminated, Donahue asked Matson about Sumner's progress. Matson told Donahue that Sumner "had frequent slip-backs. That she was not consistent in her practices . . . . And it was discussed by Kristine and I that she was not meeting her goals. . . . [S]he asked me my recommendation, if she should be continuing her employment. And I said, 'No.'" (ECF No. 27-7, PageID.496.) Sumner was terminated on December 4, 2019. (ECF No. 27-71.)

## C. Procedural History

About a year after her termination, after filing an EEOC complaint, Sumner sued Beaumont Health System and Beaumont Hospital Taylor. (ECF No. 1.) Sumner raised the following claims: race discrimination in violation of Title VII (Count I); race discrimination in violation of the Elliott-Larsen Civil Rights Act (ELCRA) (Count II); retaliation in violation of Title VII (Count III); retaliation in violation of the ELCRA (Count IV); wrongful termination contrary to explicit legislative enactment

13

prohibiting termination (Count V); wrongful termination for exercise of right conferred by well-established legislative enactment (Count VI); and violation of the Emergency Medical Treatment and Active Labor Act (EMTALA) (Count VII).

Following extensive discovery, Beaumont filed for summary judgment. (ECF No. 27.) The parties have provided substantial briefing that enables resolution of the motion without the need for further argument. *See* E.D. Mich. LR 7.1(f).

In her response to the motion, Sumner states she is no longer pursuing Counts V–VII of her complaint and makes no argument in support of those claims. (ECF No. 36, PageID.957.) So those claims will be dismissed. And for the reasons that follow, the other claims under Title VII and the ELCRA will also be dismissed.

## II.

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Or, stated less formally, Beaumont is entitled to summary judgment only if no reasonable jury could find in favor of Sumner. *See Anderson*, 477 U.S. at 251–52.

## III.

## A. Exhaustion

Beaumont raises a threshold issue that Sumner did not exhaust her Title VII claims because she did not check the race-discrimination box on her EEOC charge. (ECF No. 27-72.)

"An employee alleging discrimination or retaliation in violation of Title VII must first file an administrative charge with the EEOC within a certain time after the alleged wrongful act." *Barrow v. City of Cleveland*, 773 F. App'x 254, 260 (6th Cir. 2019) (citing 42 U.S.C. § 2000e-5(e)(1)). "[T]he general rule in this circuit [is] that the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Id.* (quoting *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004)).

Here, while Beaumont is correct that the charge of discrimination only checks "retaliation" as the basis of the complaint, the EEOC inquiry information lists both race and retaliation as the reason for complaint. (*See* ECF No. 36-11.) Further, the inquiry information states that Sumner alleges "she was placed on a PIP and terminated due to her race and in retaliation in violation of Title VII[.]" (*Id.* at PageID.1226.) An EEOC charge should be "construed liberally," *Barrow*, 773 F. App'x at 260, and it appears that the EEOC investigation prompted by the charge included race discrimination and retaliation. (*See generally* ECF No. 36-11.) So the Court finds that Sumner exhausted her Title VII discrimination claims.

15

### B. Failure-to-Promote Claim

Turning to the merits, the Court begins by addressing Sumner's failure-to-promote claims under Title VII and the ELCRA.

Under Title VII, "[t]o establish a prima facie case of discrimination for her failure to promote claim, [Sumner] must show, among other things, that . . . she applied for and was qualified for the position" and "an individual of similar qualifications who was not a member of the protected class received the promotion." *Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x 518, 524 (6th Cir. 2015) (citing *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005)). Under the ELCRA, the showing is similar—Sumner must show she "was qualified for the position" and "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 523 (Mich. 2001).

There are three director-level positions that, according to Sumner, she was qualified for, but Beaumont denied her the promotion: Director of Nursing for Critical Care, Director of Nursing for Med/Surg over two hospitals, and Director of Nursing for Med/Surg over just the Taylor hospital. (ECF No. 27-2, PageID.239.)

Consider the two director positions Sumner did apply for, Director of Nursing for Critical Care and Director of Nursing for Med/Surg at Taylor and Wayne hospitals. Sumner cannot make a prima facie case for failure-to-promote for these positions as she cannot show that the person who received the promotion was outside of her protected class and had similar qualifications, *Crane*, 634 F. App'x at 524, or

similarly under the ELCRA, that "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination," *Hazle v. Ford Motor Company*, 628 N.W.2d at 521. Here, Donahue testified that neither director position Sumner applied for was filled, and both were cancelled. (ECF No. 27-3, PageID.307 ("I could have possibly announced that the two dual positions were being removed and that there was going to be one posting on the Taylor campus.").) And Sumner has not put forth any evidence that, if the roles were filled, they were filled by someone outside of the protected class with similar qualifications. So Sumner cannot make a prima facie case for failure-to-promote for the two positions she applied for.

Consider the Taylor position next, which is the job that replaced the two cancelled positions and that Matson eventually filled. Sumner never applied for that position. (ECF No. 27-2, PageID.254.) So it appears that Sumner cannot satisfy a necessary element of a failure-to-promote claim for the Taylor position either.

But the analysis does not end there. A plaintiff can still succeed on a failure-to-promote claim under Title VII and the ELCRA if she did not apply for the position at issue if she shows that "'the employer promotes employees into the position[] in question without asking for applications or posting the opening so that employees could apply for the position[].'" *Russell v. Three Pillars, Inc.*, No. 21-12481, 2022 WL 351770, at *5 (6th Cir. Feb. 7, 2022) (quoting *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 145–46 (6th Cir. 1989)).

Sumner contends that this exception applies to the Taylor position. (ECF No. 36, PageID.968.) The record shows, however, that this position was listed in a similar fashion as the other two director positions that Sumner did apply to. (*Compare* ECF No. 36-12, PageID.1228 (posting for Director of Nursing role for both Wayne and Taylor), *with* ECF No. 36-12, PageID.1231 (posting for Director of Nursing role for Taylor).) Krolicki also testified that the Director of Nursing for Taylor position was posted in March 2019. (ECF No. 27-4, PageID.381.) And Matson, who was ultimately selected for that position, testified that she was able to apply to the position via a "job search" in the same way she was able to apply for the dual-hospital Director of Nursing position. (ECF No. 27-7, PageID.468.) Sumner was apparently able to apply to the dual-hospital position (ECF No. 36-4), so the reasonable inference would be that, like Matson, she was also able to apply to the single-hospital director position but failed to do so.

True, Sumner did testify that she did not apply for the Taylor director role because she "did not have access to apply for that." (ECF No. 27-2, PageID.254.) But Sumner also testifies that she "did not see those postings" and that she "was not aware of that." (*Id.*) According to Sumner, "it was all, you know, the same." (*Id.*) Even Sumner does not contend that Beaumont filled the position without taking applications, so she cannot pursue a failure-to-promote claim based on not being selected for the Director of Nursing for Med/Surg position at the Taylor hospital.

Thus, any claim Sumner has based on a failure-to-promote under either Title VII or the ELCRA is dismissed.

### C. Race-Discrimination Claim

Before considering the merits of Sumner's race discrimination claim under Title VII and the ELCRA, some law on the standards is helpful.

Sumner relies on indirect evidence of discrimination, so the familiar *McDonell-Douglas* burden-shifting framework applies for claims under both Title VII and the ELCRA. *Spratt v. FCA US LLC*, 812 F. App'x 348, 352–53 (6th Cir. 2020); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001). Under this framework, Sumner must first establish a prima facie case of discrimination. *Spratt*, 812 F. App'x at 353. Then, it is up to Beaumont to produce evidence of a "legitimate, nondiscriminatory reason" for Sumner's termination. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Hazle*, 628 N.W.2d at 521–22. If Beaumont satisfies its burden, then the third step requires Sumner "to prove the reasons proffered by [Beaumont] were not its true reasons but were mere pretexts for prohibited discrimination." *Spratt*, 812 F. App'x at 353; *see also Hazle*, 628 N.W.2d at 522.

### 1. Prima Facie Case

Beaumont makes two arguments for why Sumner cannot make a prima facie case for race discrimination under Title VII and the ELCRA. Both arguments, however, are better addressed when the Court discusses pretext.

Beaumont's first argument contends that Sumner "has no evidence that Donahue was predisposed to discriminate against African-American employees, let alone acted on any such predisposition." (ECF No. 27, PageID.200.) Beaumont is correct that "the plaintiff cannot simply show that the employer's decision was wrong

19

or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *See White v. Dep't of Transp.*, 964 N.W.2d 88, 94 (Mich. Ct. App. 2020). But circumstantial evidence is also "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). So at the prima facie stage, Sumner need not provide evidence that Donahue was "predisposed" to discriminate against her or that Donahue made discriminatory statements. (*See* ECF No. 27, PageID.201.) And as to whether Sumner has provided evidence that would allow a factfinder to infer discriminatory animus, the Court will address that when it determines whether Beaumont's reasons for termination are pretext for discrimination.

Beaumont's second argument is that Sumner cannot show that it treated a similarly situated employee outside of the protected class more favorably. At this stage, however, Sumner is only required to show either that a similarly situated employee outside of the protected class was treated more favorably *or* that she was replaced by a person outside the relevant class. *See Jackson v. Trinity Health*, 656 F. App'x 208, 219 (6th Cir. 2016).

Sumner was replaced by Sheryl Aerson. (ECF No. 27-7, PageID.511.) Sumner's brief states Aerson is white, but the Court has not identified that fact in the record. (*See* ECF No. 36, PageID.971.) Beaumont's reply brief does not dispute this contention. So because the prima facie burden is not "onerous," *Jackson*, 656 F. App'x

at 218, and because Sumner does not ultimately prevail on this claim, the Court will assume that Sumner has established a prima facie case of race discrimination.

## 2. Non-Discriminatory Reasons and Pretext

Even assuming Sumner has made a prima facie case of race discrimination, her claim still does not survive summary judgment. When considering the last two parts of the analysis—Beaumont's non-discriminatory reasons for termination and whether these reasons were pretextual—the Court finds that a reasonable jury cannot conclude that Sumner's termination was a result of discrimination.

As a reminder, Beaumont terminated Sumner for poor performance. (ECF No. 27-71.) Beaumont provides evidence that Sumner's performance issues, in general, included a lack of availability and visibility to her nursing staff; lack of prioritization of safety in her department, specifically untimely investigation and closure of RLs (i.e., safety complaints) and untimely ordering of bed chords; scheduling an inappropriate number of nurses for each shift; not following through or supporting new projects in her department; complaints from staff about favoritism and lack of support; and lack of accountability for these performance issues. The existence of these issues is supported by the record from both before and after Sumner complained about discrimination in February 2019. (*See, e.g.*, ECF No. 27-2, PageID.244 (stating Sumner made a complaint in February 2019); ECF No. 27-18 (Sept. 2018 email to Sumner about not implementing patient journal initiative); ECF No. 27-13, PageID.536 (Dec. 2018 email to Sumner about closing RLs); ECF No. 27-13, PageID.545 (January 2019 email to Sumner about "continuing issue" of completing

21

RLs); ECF No. 27-49, PageID.765 (April 2019 email from Brown to Sumner detailing Brown's concerns); *id.* at PageID.766 (April 2019 email from Brown to Sumner about issuing attendance corrections); ECF No. 27-63 (Sept. 2019 email to Sumner about closing RLs).)

So Beaumont has met its burden of showing a "legitimate, nondiscriminatory reason" for Sumner's termination. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (finding that UPS had met its burden of providing a legitimate nondiscriminatory reason for an employee's demotion because of "failure to correct on-going performance deficiencies and his failure to meet reasonable expectations as set forth in the MPIP.").

Turning to pretext, under both Title VII and the ELCRA, Sumner can establish pretext by showing that a similarly-situated employee outside of her protected class was treated better than she was. *See Smith v. City of Toledo*, 13 F.4th 508, 515 (6th Cir. 2021) (Title VII); *Hecht v. Nat'l Heritage Acads., Inc.*, 886 N.W.2d 135, 147 (Mich. 2016) (providing that under the ELCRA, "An employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination.").

Sumner identifies several white Beaumont employees, both former and current, that she contends were similarly situated but treated more favorably. For these employees to be considered adequate comparators to Sumner, she must show that she was similar to them "in all *relevant* aspects." *Crane v. Mary Free Bed Rehab. Hosp.*, 634 F. App'x 518, 525 (6th Cir. 2015); *see also Redlin v. Grosse Pointe Pub.*

*Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019); *but see Hecht*, 886 N.W.2d at 147 (providing that under the ELCRA, "our cases have held that the 'comparable' employees must be 'nearly identical' to the plaintiff in all relevant aspects"). Generally, the Sixth Circuit has identified three factors in determining whether two employees are similarly situated: they "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in substantially identical conduct without differentiating or mitigating circumstances that would distinguish their employer's differential treatment of them." *Spratt v. FCA US LLC*, 812 F. App'x 348, 353 (6th Cir. 2020) (citing *Redlin*, 921 F.3d at 610). These "factors are not inflexible requirements" though and should be "applied on a case-by-case basis." *Id.*

The Court starts with Levi Launder, who was the Clinical Nurse Manager for the Emergency Center. Both Launder and Sumner dealt with the same supervisor, Matson, and held the same title, but for different departments. (*See* ECF No. 27-7, PageID.468.) But the only evidence Sumner points to in support of showing that Launder engaged in "substantially identical conduct" is a portion of Matson's testimony where she states that "a couple times ER did not meet productivity . . . ." (*Id.* at PageID.472.) Sumner states that this was a reason Beaumont provided for putting her on a PIP and ultimately firing her, but Launder was not placed on a performance plan at all. The record shows, however, that there were "differentiating or mitigating circumstances" explaining the difference in treatment. Matson explained that the productivity metric was skewed for the ER department because of "holders in the ER," meaning that when there is not a bed ready to house patients in

other departments, the patients are kept in the ER. (*Id.*) Matson went on to say that once her and Launder determined the cause of the low-productivity numbers, they were able to explain the variance. (*Id.*) The ER faced a unique circumstance that affected its productivity and that appeared to be out of Launder's control. So Launder cannot be used as a proper comparator as he faced different issues in his department than Sumner, and thus a comparison of their treatment, especially on only one narrow performance issue, does not give rise to the inference of discrimination.

The Court next looks at Jeanette Torrico, another purported comparator. But Torrico's position was quite different than Sumner's: Torrico was a Clinical Nurse Specialist who oversaw research for the nursing rehabilitation unit. (ECF No. 36-3, PageID.1169.) Sumner provides little other evidence about Torrico, including who her supervisor was, what (if any) of their job responsibilities overlapped, or why Torrico was asked to transfer positions. And from what was provided, Torrico's role is different from Sumner's in a significant way as Sumner was not responsible for any sort of research, so she was likely held to different standards. Torrico therefore cannot be a proper comparator to Sumner.

The other three comparators provided by Sumner—Mike Davis, Edie English, and Ann Prouty—were, unlike Sumner, all directors of some kind. Davis was Director of Diagnostics (ECF No. 27-3, PageID.284), English was Director of Nursing (*id.*), and Prouty was Director of Nursing Education (ECF No. 27-2, PageID.258). Davis was terminated (ECF No. 27-3, PageID.284), English left her position (*id.*), and Prouty was allowed to transfer (ECF No. 36-3, PageID.1167). Despite their difference in title,

Sumner says that these employees are proper comparators. Like Sumner, they reported to Donahue (ECF No. 27-3, PageID.266), and it was Donahue who made the decision to fire Sumner (*id.* at PageID.312). *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (recognizing that the same supervisor factor may become the same decisionmaker factor depending on the facts of the case). Donahue also testified that Davis and English had similar performance issues to Sumner. Specifically, Davis had issues with "availability to staff, visibility to staff, improving the morale in the department, improving quality measures." (ECF No. 27-3, PageID.283.) And English likewise "had issues with organization and keeping her team on track to the deliverables regarding process improvement or quality[.]" (*Id.* at PageID.285.) Beaumont also admits that neither Davis nor English were placed on a performance action plan. (ECF No. 36-25, PageID.1415.) So there is some evidence that at least English and Davis were similar in relevant aspects to Sumner but treated more favorably.

But the comparison stops short when looking at the conduct leading up to Davis' departure from Beaumont. Donahue testified that Davis was terminated because, in addition to performance issues, he had gone to interviews on company time. (ECF No. 27-3, PageID.267.) This behavior is meaningfully different from what Beaumont says prompted Sumner's termination, and may explain why Davis was not given an opportunity to improve via a plan before he was terminated. And since Davis was terminated too, he was not treated more favorably.

25

In addition to the circumstances of Davis' termination, directors at Beaumont are not proper comparators for Sumner because they were held to different standards. See *Campbell v. Hamilton Cnty.*, 23 F. App'x 318, 326 (6th Cir. 2001) ("Campbell and Boyle had different job titles, different levels of experience at the time they were disciplined, and different disciplinary histories."). In other words, their difference in title also reflected a difference in what Beaumont required of them.

Take the written descriptions of the director position as compared to the clinical nurse manager position. The most obvious difference is that a director is in charge of various departments, while the clinical nurse manager is in charge of a single department. (*Compare* ECF No. 36-12, PageID.1229 *with* ECF No. 27-8, PageID.514–515.) The Director of Nursing also has a larger role regarding the budget. The director "monitors and leads division budget process," while the clinical nurse manager "assists in the development and maintains operations of the unit within fiscal and productivity guidelines." *Id.* And the leadership experience requirements are different as well, with the director position requiring five or more years of experience, and the clinical nurse manager position requiring three to five. *Id.*; *see also Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) ("Because of these differences [in experience], no reasonable jury could find that Fly and Tennial are similarly situated in all relevant respects.").

Further, the clinical nurse manager is also responsible for specific tasks related to nurse safety and development which are not required of the director. For example, Sumner was responsible for issuing corrective actions for attendance policy

violations (ECF No. 27-42, PageID.690), investigating safety complaints (*id.*), and submitting different reports on time, such as crash cart logs, clinical alert deployments, and the yearly schedule of monthly staff meetings (*id.*). And because some of these items directly relate to the safety of patients and nurses, Beaumont may have reasonably chosen to treat Sumner more severely than English because of the heightened consequences of these issues. *See Colvin v. Veterans Admin. Med. Ctr.*, 390 F. App'x 454, 459 (6th Cir. 2010) ("The potential harm from their respective actions is sufficiently different to distinguish their conduct and their treatment by VAMC.").

Sumner argues that the directors and the clinical nurse manager were subject to the same standards because they were both reviewed using the Leader Performance Recognition and Development Plan. The evidence shows otherwise. Donahue testified that "There is a standard form but you can—the leader can put in certain goals or certain things. It's not standard across the board." (ECF No. 27-6, PageID.432.) Sumner does not show that the goals for her plan and a director's plan were the same or similar. In fact, the evidence detailed above about their respective duties indicates that their goals were likely not similar. So using the same performance-evaluation form cannot, on its own, show that directors were similarly situated to clinical nurse managers like Sumner.

Sumner has also not shown that any of the directors share a similar or equivalent disciplinary history. Sumner had been made aware of performance concerns from September 2018 until the date of her termination. She was placed on

various performance plans by two different supervisors during this time. There is no evidence that the director-level comparators were given a similar amount of time or opportunity to improve, or that they had a similar history of struggling with their performance. *See Smith v. City of Toledo*, 13 F.4th 508, 515 (6th Cir. 2021) (finding that since no other recruit had been given more than three chances to pass a test necessary to graduate from the academy, no other recruit was similarly situated).

In sum, because of the differences in their actions leading up to termination, the duties they were responsible for, and their disciplinary histories, none of Prouty, Davis, or English are proper comparators to Sumner. Sumner has therefore not shown that a reasonable jury could find that Beaumont treated a similarly situated, non-protected employee better than Sumner.

Sumner has other options to show pretext, though. A "plaintiff may demonstrate the pretext necessary to defeat a motion for summary judgment 'by showing that the proffered reason [for the adverse employment action] (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Jackson*, 656 F. App'x at 219 (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (2003)). Michigan courts have said the same: "[t]o prevail, the employee must submit admissible evidence to prove that the employer's nondiscriminatory reason was not the true reason for the discharge and that [prohibited discrimination] was a motivating factor in the employer's decision." *Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 68 (1997).

Sumner presents a number of challenges to Beaumont's performance-based reasons for firing her, most of which fall into the bucket of contesting whether the proffered reason has a basis in fact.

First, Sumner states that she did not receive "any written reprimands" and was not "counseled or coached on documented performance problems" before her first complaint of discrimination. (ECF No. 36, PageID.979.) The Court disagrees with Sumner's interpretation of the record. There are emails from as early as September 2018 informing Sumner of various issues, which show that Sumner was informed in writing of certain deficiencies and instructed to correct or complete them. Sumner further tries to recast these emails as "one-off problems," but that does not mean that they are neither legitimate reasons for termination nor insignificant. (*See* ECF No. 36, PageID.979.) And as discussed earlier, certain issues (such as completing RLs on time) were documented multiple times, and implicate patient safety, which is a reasonable issue for Beaumont to emphasize. And perhaps most significant, there is nothing to suggest these performance issues were raised because Sumner is Black.

Sumner also attacks the factual basis of her Culture of Safety scores, which Beaumont uses to show her poor performance. Sumner's staff were given a Culture of Safety survey to rate their perception of safety within their department. (ECF No. 27-2, PageID.247.) The record shows that the scores for Sumner's department had decreased in June 2019, the latest scores available under Sumner's leadership. (ECF No. 27-28, PageID.601–603.) Sumner admits that "When I came to Taylor, [the Culture of Safety scores] were low, and they remained in this situation low." (ECF

No. 27-2, PageID.247; *see also* ECF No. 27-73, PageID.893 (Sumner writes, "as you know, COS scores have not risen.").) Sumner also admits she was told by her supervisor that her job was in jeopardy due to her low Culture of Safety scores. (ECF No. 27-2, PageID.247.)

Beaumont blames Sumner's low Culture of Safety scores on her "lack of leadership." (ECF No. 27, PageID.187.) Sumner, on the other hand, points to the Culture of Safety comments where staff complained about the number of staff and "pulling" from the department as the reason the scores were so low. (ECF No. 36, PageID.981–982.) True, many of the comments complain about the lack of staff in general. (ECF No. 27-28, PageID.617.) And this complaint was common among every department's Culture of Safety results, not just Sumner's. (*See generally* ECF No. 36-19.) So a reasonable jury could conclude that Sumner cannot be held entirely responsible for the low Culture of Safety scores of her department when faced with a nursing shortage that seems to affect every department at Beaumont Taylor. This conclusion is further supported when comparing Sumner's June 2019 Culture of Safety scores with the scores of other departments, none of which were above 52%, with the goal being 70%. (ECF No. 36-19.)

But this context for the Culture of Safety scores is not enough to show that a reasonable jury could find that discrimination, and not performance issues, was the true reason behind Sumner's termination. For one, Sumner received several specific criticisms in the Culture of Safety scores from her nurse staff. (ECF No. 27-28, PageID.617 ("Our Manager Lori Sumner shorts our floor RNs to accommodate special

privileges for [another nurse]. Our manager Lori Sumner lies about getting jobs filled. . . . Our manager Lori makes back door deals to get better staffing on[e] day while shortening another. She does this with favorites. This can be easily verified by looking at schedules and the amount of changes made."); *id.* ("When it is brought to managers attention that staffing is going to be low on certain days/weekends, I would appreaciate [sic] her taking the time to actually look and move people around before the schedule is posted"); *id.* ("Preference is being seen towards certain staff members and a concern that requests will not be honored. Already, the schedule disregarded most requests for July. Not good for morale!").) While the record shows that other departments had similar complaints about staffing and a lack of transparency and support from "leaders" (ECF No. 36-19), the comments are often not specific as to who is responsible for these issues, unlike the comments about Sumner.

True, the Culture of Safety results contain specific criticisms of Denise Davis (Sumner's predecessor) and her management style going back to 2015. (ECF No. 36-19, PageID.1370.) But if this evidence is meant to show that Sumner is blameless for long-standing complaints about management, it does no such thing. The complaints from 2015 detail embarrassing and scolding nurses in front of others and ignoring staff concerns, which are different from the comments Sumner received about favoritism and scheduling issues. (ECF No. 36-19, PageID.1370.) The issues are different enough and specific to Sumner such that every reasonable jury would conclude that she struggled with leading her unit. And if the evidence about Davis is meant to show that other managers had negative Culture of Safety feedback but only

31

Sumner was terminated for it, it does not do that either because there is no evidence that Davis was not reprimanded or terminated by Beaumont.

More importantly, though, the Culture of Safety scores are not the only evidence of Sumner's subpar performance. So debunking the Culture of Safety scores alone cannot show pretext. Sumner does identify several other arguments attacking the other reasons Beaumont provides for her termination. But these too are insufficient to show pretext.

"If an employer has an 'honest belief' in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext." *Block v. Meharry Medical* College, 723 F. App'x 273, 280 (6th Cir. 2018). In other words, even if a reasonable jury could conclude that Sumner's Culture of Safety scores do not show poor performance, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 401 (6th Cir. 2009). "To overcome this honest belief and  demonstrate pretext,  the plaintiff must produce sufficient evidence from which the jury could reasonably reject this explanation and instead infer that the defendant intentionally discriminated against [her]." *Id.* Significantly, the Sixth Circuit notes that "[d]isputing facts is not enough—instead, the plaintiff must produce evidence demonstrat[ing] that the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Id.*

Though Sumner did submit a rebuttal to the PIP that details her disagreement with many of the performance-based issues listed (ECF No. 27-47, PageID.757), that alone is not enough to show that a reasonable jury could find pretext. Instead, Sumner must show that not only did she not have performance issues, but that Donahue and her other supervisors did not truly believe she had those issues.

Sumner cannot meet this burden.

Take the first issue listed in the PIP: Sumner's failure to issue corrective actions for attendance violations in a timely and appropriate manner. (ECF No. 27-47, PageID.757.) The Court agrees with Sumner that the record provides little detail about this issue, such as the number of missed corrective actions or examples of corrective actions she should have taken.

But Beaumont does not need to provide the level of detail Sumner demands. Instead, it need only provide evidence that Brown and Donahue believed the lack of attendance corrective actions to be an issue. In the February 2019 draft performance plan, which was drafted 11 days before Sumner first complained, Donahue wrote "Attendance accountability: Audits performed weekly/pay period to track points and implement necessary actions. All CA to be monitored and issued by Lori at the end of each pay period." (ECF NO. 27-38, PageID.669.) Then, in April 2019, Brown told Krolicki, "I will be discussing with Lori Monday 4/8/2019 that her follow up on RL's, corrective actions for attendance and schedule have not improved. This is really causing a strain on her team as well as others that have to work with her." (ECF No. 27-49, PageID.764.) There is also an email exchange between Brown and Sumner on

the issue of attendance corrective actions where Brown stated, "I've gone through the last 2 months and have noticed I have not received write ups for attendance on the complete list of employees Michelle sends." (*Id.* at PageID.766.) Sumner disagreed that they were not timely and explained that another employee was making mistakes which she had to correct, causing delay in issuing the corrective actions. (*Id.*) Brown replied with her remaining concerns about the corrective actions, despite the other employee's mistakes. (*Id.* at PageID.765.) This email exchange shows that Brown honestly believed that Sumner was not issuing corrective actions appropriately. Sumner has not provided any evidence contesting this other than the lack of details provided to Sumner. But an inability to testify to the exact number of missed corrective actions cannot contradict evidence of Brown's real-time concerns that she had not received "write ups for attendance." (ECF No. 27-49, PageID.766.) So Sumner has not shown that this reason for her termination was pretextual.

Next, Sumner challenges Beaumont's claim that she did not escalate "barriers stemming from pilots, initiatives[.]" (ECF No. 27-47, PageID.757.) She argues that the only example Beaumont provides of this is the patient journal initiative and there is no evidence that she was given a directive to perform this initiative or written guidance as to how to do that. The issue Beaumont identified, however, was Sumner not informing her supervisors of the challenges she and her staff faced in implementing the initiative—Beaumont does not fault Sumner for not knowing that she was supposed to implement the initiative. The record shows that this was an issue noted by Donahue in November 2018. (ECF No. 27-18, PageID.572–573.) Only

34

after Donahue asked Sumner why more patient journals had not been collected did Sumner indicate issues the staff faced with the project. (*Id.*) Further, Sumner's response at the time indicates that she was aware of her responsibility to collect the surveys. (*Id.* at PageID.573.) Instead, she explained why more surveys had not been collected by her team. (*Id.*) Further, in addition to the patient journal surveys, there is evidence that Sumner was not supportive of other projects or initiatives involving her team. (ECF No. 27-22, PageID.584 (literature review); ECF No. 27-70, PageID.858 (focus groups).) So there is no evidence that not escalating barriers to implement new projects was a pretextual reason for Sumner's termination.

Similarly, Sumner argues that Beaumont did not provide any data or details for its assertion that she did not investigate RLs (safety incident reports) in a timely or thorough manner. (ECF No. 27-47, PageID.757.) The record shows at least a couple of instances where Sumner was given the specific RLs that were not closed on time. (ECF No. 27-16, PageID.561 (email detailing an audit of which RLs had not been closed as of December 26, 2018); ECF No. 27-63 (sending Sumner a specific RL that is not closed).) And again, for purposes of pretext, it is not enough for Sumner to dispute Beaumont's interpretation of the facts. Instead, she must show that Beaumont did not honestly believe she had issues with the RLs. But the record provides ample support otherwise. In January 2019, Brown told Donahue that "I meet with Lori consistently about RL follow up and ensuring she's closing them out correctly. There seems to continue to be a struggle for her." (ECF No. 27-13, PageID.542.)  In April 2019, Brown again told Donahue that she is concerned with

Sumner investigating the RLs appropriately. (ECF No. 27-53, PageID.778.) In August 2019, Donahue was also told by the Quality Department that one of Sumner's RL investigations was inaccurate. (ECF No. 27-64.) The recurring nature of the issues with the RLs supports a finding that Beaumont honestly believed that Sumner had issues completing the RL process.

In fact, Matson provides further evidence that Donahue had specific reasons to believe that Sumner continued to have performance issues when she was terminated. Matson testified that in early December 2019, Donahue asked her about Sumner's performance. Matson, who had been working with Sumner on a performance plan (which was different from the PIP), told Donahue that Sumner "had frequent slip-backs. That she was not consistent in her practices . . . . And it was discussed by Kristine and I that she was not meeting her goals . . . she asked me my recommendation, if she should be continuing her employment. And I said, 'No.'" (ECF No. 27-7, PageID.496.) This is especially significant as Matson was not at Beaumont when Sumner first complained, and was not in charge of interview selection, which was Sumner's main discrimination complaint. So it is unlikely that Matson would have an ulterior motive to report Sumner's performance issues.

Sumner points out that her performance action plan states that she had completed many of the items listed. (ECF No. 36-26.) But many items are also listed as "ongoing" because of the nature of the task. For example, "Review of RL Solutions resolutions with staff" was listed as ongoing, likely because it was Sumner's responsibility to do this as long as she was a clinical nurse manager. (*See* ECF No.

36-26, PageID.1418.) Matson also explained that even if a certain task was listed as complete or ongoing, and on track to be accomplished, Sumner still had "setbacks." (ECF No. 27-7, PageID.496.) And of course, it is not whether Matson was correct in her judgment of Sumner's performance, but the fact that she told Donahue that Sumner "did not perform as she was supposed to as a nurse manager." (*Id.*) That information, plus the other information Donahue had collected in the past year, shows that Donahue honestly believed that Sumner had performance issues and should thus be terminated.

The Court addresses one remaining argument Sumner presents for why a reasonable jury could conclude that discrimination motivated her termination. Sumner states that there is evidence that other Black employees have complained about Donahue's treatment of them. Specifically, according to Sumner, Brown told Sumner that she had similar experiences with Donahue where she felt that Donahue treated her differently because of her race. (ECF No. 36-23, PageID.1401.)

This evidence is not sufficient to show that Donahue's termination of Sumner was motivated by discrimination, however. Sumner's testimony that she and Brown had similar, discriminatory experiences directly contradicts Brown's own testimony that her issues with Donahue did not involve discrimination and that she never filed a complaint about race discrimination. (ECF No. 27-6, PageID.422, 424.) Even assuming that Sumner's testimony is truthful, however, it is still not enough to show that Donahue fired Sumner due to her race. Even if Brown (who still works at Beaumont) stated she felt Donahue treated her differently because of her race, that

would not be enough to cast doubt on Sumner's several, documented performance issues. Sumner must do more to connect those alleged instances of discrimination to her termination, and she has not done so.

In sum, Sumner's proposed comparators were not similarly situated to her such that Beaumont's different treatment of them (to the extent it even existed) constitutes evidence of race discrimination. Sumner's additional challenges to Beaumont's nondiscriminatory reasons for her termination also fail as the record evidence shows that Sumner's supervisors, including Donahue, honestly believed Sumner struggled to meet expectations in her role and were presented with specific facts to support their belief. And Beaumont provides many examples of Sumner's employees complaining about her in both the Culture of Safety survey results and the Engagement Survey results. Finally, Sumner's testimony that Donahue acted in a discriminatory manner toward Brown is insufficient to show that Donahue acted based on discrimination, and not Sumner's performance issues, when terminating Sumner.

Thus, Sumner's claims of race discrimination under Title VII and the ELCRA are dismissed.

**D. Retaliation Claim**

The Court turns to Sumner's claim that her termination was retaliation for her complaints about discrimination from February through June 2019.

Beaumont only contests one element of Sumner's retaliation claim: causation. The standard for causation under Title VII is but-for causation. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). The causation standard under ELCRA is a bit unclear, but it seems as if but-for causation applies there as well. Even after the Supreme Court's decision in *Nassar*, the Michigan Court of Appeals has continued to state that retaliation claims under ELCRA require a plaintiff to show that the protected conduct was a "significant factor" in the adverse action. *See e.g., Cadoura v. Flat Rock Fire Dep't*, No. 353618, 2021 WL 4238119, at *7 (Mich. Ct. App. Sept. 16, 2021). But the origin of this "significant factor" language is the Michigan Court of Appeals' decision in *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001), which in turn relied on the Sixth Circuit opinions in *Jacklyn* and *Polk*. But, as the Sixth Circuit recently noted, "Since *Jacklyn* and *Polk*, this court has found that the causation element of Title VII and the ELCRA are the same." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 349 n.5 (6th Cir. 2021); *see also Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 614 n.9 (6th Cir. 2019). Accordingly, and having not been provided anything to the contrary from the parties, the Court finds that to prevail under the ELCRA, Sumner must meet the but-for standard. *See Beard v. AAA of Michigan*, 593 F. App'x 447, 452 (6th Cir. 2014)

(reasoning that Michigan courts would interpret ELCRA to require but-for causation).

The record of temporal proximity does provide some evidence that retaliation motivated Sumner's termination. Sumner filed her first complaint of race discrimination in February 2019. Donahue testified that in May 2019, she "had conversations with HR to possibly terminate Lori before Jen [Matson] was onboarded but did not think that would make Jen successful, so we had conversations with Jen to keep Lori in this employment versus create this additional burden on Jen[.]" (ECF No. 27-3, PageID.299.) So the timing of Sumner's initial complaint and Donahue's desire to terminate Sumner provides some evidence showing "that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *See Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013). But temporal proximity alone is rarely enough, and Sumner was not actually terminated until December 4, 2019, about ten months after her first compliance complaint and six months after her last compliance complaint. (*See* ECF No. 27-71); *see also Jones v. Vilsack*, 861 F. App'x 58, 61 (6th Cir. 2021) ("Generally speaking, the more time that elapses between the employer learning of an employee's protected activity and the subsequent adverse employment action, the less temporal proximity between those acts, thereby requiring more evidence of retaliatory motive from the employee."). So the timing is not sufficient on its own to show causation, but does show that soon after Sumner complained, Donahue had all but finalized her termination.

There is also evidence that not only was Donahue aware of Sumner's complaints, but had them in mind when discussing Sumner and her termination. In August 2019, Donahue wrote to Krolicki about Sumner's issues: "Jen had a crucial conversation with her in that if Lori does not stay on track she would have no choice but to move her along . . . Has there been a compliance complaint yet?" (ECF No. 27-67, PageID.848.) On October 29, 2019, shortly before Sumner was terminated, Donahue wrote, "the hold has been lifted from Lori, I found the nail to seal the deal! I am sure a compliance hotline complaint is coming . . . ." (ECF No. 36-15, PageID.1241.) So a reasonable jury could infer from these emails that but-for Sumner's complaints, Donahue would not have been as eager to "seal the deal" on Sumner's termination.

Nonetheless, even if the email is direct evidence that "if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor" in Donahue's termination of Sumner, the burden then "shifts to [Beaumont] to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *See Jackson v. Genesee Cnty. Road Commission*, 999 F.3d 333, 349 (6th Cir. 2021).

Beaumont has met its burden. As explained above when discussing pretext for Sumner's race discrimination claim, Beaumont has provided evidence that Donahue had doubts about Sumner's performance since 2018, before Sumner filed her first complaint. As early as July 2018, Donahue stated, "Lee Ann and I rounded on the 2nd floor yesterday and it was a bit dismal." (ECF No. 27-11, PageID.529.) Issues like the

RL investigations, supporting new initiatives within the department, and complaints about favoritism were recurring, with three different supervisors describing issues with Sumner's performance.

Though the email was certainly callous and ill-advised, a reasonable jury could still not conclude that but-for Sumner's complaint, she would not have been terminated in December 2019. And to the extent that Sumner's retaliation claim is premised on the issuance of a PIP, it also fails. On February 7, 2019, Donahue emailed Brown and Krolicki a draft of a PIP for Sumner. (ECF No. 27-38, PageID.667.) This was 11 days *before* Sumner verbally reported her complaint of race discrimination, so her PIP could not have been retaliatory. (*See* ECF No. 27-2, PageID.244.) So for the same reasons provided there, Sumner has not shown that a reasonable jury could find that but-for her complaint, she would not have been terminated.

Therefore, Sumner's retaliation claim under Title VII and the ELCRA is also dismissed.

## IV.

In conclusion, for her failure-to-promote claims, Sumner either did not show that she applied for the director position or did not show that a non-protected employee was selected over her for the director position she applied for. So her failure-to-promote claims are dismissed. As for race discrimination and retaliation, Sumner has not met her burden of showing that Beaumont's reasons for her termination were pretext for discrimination or retaliation. So she cannot pursue those claims either.

Thus, Sumner's Title VII and ELCRA claims for failure to promote, race discrimination, and retaliation are DISMISSED. And per Sumner's agreement, her public policy tort and EMATLA claims are also DISMISSED. A separate judgment will follow.

SO ORDERED.

Dated: May 3, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE